# UNITED STATES *v.* WILSON

No. 73–1395.   Argued December 9, 1974—Decided February 25, 1975

*Deputy Solicitor General Frey* argued the cause for the United States.   With him on the brief were *Solicitor*

*General Bork, Assistant Attorney General Petersen,* and *Edward R. Korman.*

*Philip D. Lauer* argued the cause and filed a brief for respondent.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent George J. Wilson, Jr., was tried in the Eastern District of Pennsylvania for converting union funds to his own use, in violation of § 501 (c) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 536, 29 U. S. C. § 501 (c). The jury entered a guilty verdict, but on a postverdict motion the District Court dismissed the indictment. The court ruled that the delay between the offense and the indictment had prejudiced the defendant, and that dismissal was called for under this Court's decision in *United States* v. *Marion,* 404 U. S. 307 (1971). The Government sought to appeal the dismissal to the Court of Appeals for the Third Circuit, but that court held that the Double Jeopardy Clause barred review of the District Court's ruling. 492 F. 2d 1345 (1973). We granted certiorari to consider the applicability of the Double Jeopardy Clause to appeals from postverdict rulings by the trial court. 417 U. S. 908 (1974). We reverse.

I

In April 1968 the FBI began an investigation of respondent Wilson, the business manager of Local 367 of the International Brotherhood of Electrical Workers. The investigation focused on Wilson's suspected conversion in 1966 of $1,233.15 of union funds to pay part of the expenses of his daughter's wedding reception. The payment was apparently made by a check drawn on union funds and endorsed by the treasurer and the presi-

dent of the local union. Respondent contended at trial that he had not authorized the two union officials to make the payment on his behalf and that he did not know the bill for the reception had been paid out of union funds. In June 1970 the FBI completed its investigation and reported to the Organized Crime Strike Force and the local United States Attorney's Office.[1] There the matter rested for some 16 months until, three days prior to the running of the statute of limitations, respondent was indicted for illegal conversion of union funds.

Wilson made a pretrial motion to dismiss the indictment on the ground that the Government's delay in filing the action had denied him the opportunity for a fair trial. His chance to mount an effective defense was impaired, Wilson argued, because the two union officers who had signed the check for the reception were unavailable to testify. One had died in 1968, and the other was suffering from a terminal illness. After a hearing, the court denied the pretrial motion, and the case proceeded to trial. The jury returned a verdict of guilty, after which the defendant filed various motions including a motion for arrest of judgment, a motion for a judgment of acquittal, and a motion for a new trial.

The District Court reversed its earlier ruling and dismissed the indictment on the ground that the preindictment delay was unreasonable and had substantially prejudiced the defendant's right to a fair trial. The union treasurer had died prior to 1970, the court noted, so the loss of his testimony could not be attributed to

---

[1] The Court of Appeals noted that the portion of the investigation that focused on Wilson was completed by June 1969. 492 F. 2d 1345, 1346. The FBI agent who conducted the investigation testified that he had communicated with representatives of the Strike Force and the United States Attorney's Office about the case as early as December 1969. App. 28.

the preindictment delay. The union president, however, had become unavailable during the period of delay. The court ruled that since he was the only remaining witness who could explain the circumstances of the payment of the check, the preindictment delay violated the respondent's Fifth Amendment right to a fair trial. This disposition of the *Marion* claim made it unnecessary to rule on the defendant's other postverdict motions.

The Government sought to appeal the District Court's ruling pursuant to the Criminal Appeals Act, 18 U. S. C. § 3731, but the Court of Appeals dismissed the appeal in a judgment order, citing our decision in *United States* v. *Sisson,* 399 U. S. 267 (1970). On the Government's petition for rehearing, the court wrote an opinion in which it reasoned that since the District Court had relied on facts brought out at trial in finding prejudice from the preindictment delay, its ruling was in effect an acquittal. Under the Double Jeopardy Clause, the Court of Appeals held, the Government could not constitutionally appeal the acquittal, even though it was rendered by the judge after the jury had returned a verdict of guilty.

## II

The Government argues that the Court of Appeals read the Double Jeopardy Clause too broadly and that it mischaracterized the District Court's ruling in terming it an acquittal. In the Government's view, the constitutional restriction on governmental appeals is intended solely to protect against exposing the defendant to multiple trials, not to shield every determination favorable to the defendant from appellate review. Since a new trial would not be necessary where the trier of fact has returned a verdict of guilty, the Government argues that it should be permitted to appeal from any adverse postverdict ruling. In the alternative, the Government urges

that even if the Double Jeopardy Clause is read to bar appeal of any judgment of acquittal, the District Court's order in this case was not an acquittal and it should therefore be appealable. The respondent argues that under our prior cases the Double Jeopardy Clause prohibits appeal of any order discharging the defendant when, as here, that order is based on facts outside the indictment. Because we agree with the Government that the constitutional protection against Government appeals attaches only where there is a danger of subjecting the defendant to a second trial for the same offense, we have no occasion to determine whether the ruling in Wilson's favor was actually an "acquittal" even though the District Court characterized it otherwise.

## A

This Court early held that the Government could not take an appeal in a criminal case without express statutory authority. *United States* v. *Sanges,* 144 U. S. 310 (1892). Not reaching the underlying constitutional issue, the Court held only that the general appeals provisions of the Judiciary Act of 1891, 26 Stat. 827, 828, were not sufficiently explicit to overcome the common-law rule that the State could not sue out a writ of error in a criminal case unless the legislature had expressly granted it that right. 144 U. S., at 318, 322–323.

Fifteen years later, Congress passed the first Criminal Appeals Act, which conferred jurisdiction on this Court to consider criminal appeals by the Government in limited circumstances. 34 Stat. 1246. The Act permitted the Government to take an appeal from a decision dismissing an indictment or arresting judgment where the decision was based on "the invalidity, or construction of the statute upon which the indictment is founded," and from a decision sustaining a special plea in bar, when the

defendant had not been put in jeopardy.[2]   The Act was construed in accordance with the common-law meaning of the terms employed, and the rules governing the conditions of appeal became highly technical.[3]   This Court had a number of occasions to struggle with the vagaries of the Act;[4] in one of the last of these unhappy efforts, we concluded that the Act was "a failure . . . a most unruly child that has not improved with age." *United States* v. *Sisson,* 399 U. S., at 307.

Congress finally disposed of the statute in 1970 and replaced it with a new Criminal Appeals Act intended to broaden the Government's appeal rights.[5]   While the language of the new Act is not dispositive, the legislative history makes it clear that Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit.

---

[2] Significantly, the statute expressly provided that the Government could not have a writ of error "in any case where there has been a verdict in favor of the defendant."   The legislative history indicates that this provision was added to ensure that the statute would not conflict with the principles of the Double Jeopardy Clause.   See 41 Cong. Rec. 2749–2762, 2819.

[3] The statute was amended several times, but the amendments did not render its construction any simpler.   The most significant change in the statute was the 1942 amendment, 56 Stat. 271, in which Congress provided that some dismissals should be reviewed in the courts of appeals and that the Supreme Court's appellate jurisdiction should extend to prosecutions by information.   In 1968, the statute was further amended to authorize Government appeals from pretrial rulings granting motions to suppress or to return seized property.   82 Stat. 237.

[4] See, *e. g., United States* v. *Weller,* 401 U. S. 254 (1971); *United States* v. *Sisson,* 399 U. S. 267 (1970); *United States* v. *Mersky,* 361 U. S. 431 (1960); *United States* v. *Borden Co.,* 308 U. S. 188 (1939).

[5] The new statute, 18 U. S. C. § 3731, was passed as Title III of the Omnibus Crime Control Act of 1970, Pub. L. 91–644, 84 Stat. 1890.

A bill proposed by the Department of Justice would have permitted an appeal by the United States "from a decision, judgment or order of a district court dismissing an indictment or information or terminating a prosecution in favor of a defendant as to any one or more counts, except that no appeal [would] lie from a judgment of acquittal." S. 3132; H. R. 14588. The Senate Report on this bill indicated that the Judiciary Committee intended to extend the Government's appeal rights to the constitutional limits. S. Rep. No. 91–1296, p. 18 (1970). Both the report and the wording of the bill, however, suggested that the Committee thought the Double Jeopardy Clause would bar appeal of any acquittal, whether a verdict of acquittal by a jury or a judgment of acquittal entered by a judge. *Id.*, at 2, 8–12. At the same time, the Committee appears to have thought that the Constitution would permit review of any other ruling by a judge that terminated a prosecution, even if the ruling came in the midst of a trial. *Id.*, at 11.

The Conference Committee made two important changes in the bill, although it offered no explanation for them. H. R. Conf. Rep. No. 91–1768, p. 21 (1970). The Committee omitted the language purporting to permit an appeal from an order "terminating a prosecution in favor of a defendant," and it removed the phrase that would have barred appeal of an acquittal. In place of that provision, the Committee substituted the language that was ultimately enacted, under which an appeal was authorized "from a decision, judgment, or order of a district court dismissing an indictment or information . . . except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."

These changes are consistent with the Senate Committee's desire to authorize appeals whenever constitutionally

permissible, but they suggest that Congress decided to rely upon the courts to define the constitutional boundaries rather than to create a statutory scheme that might be in some respects narrower or broader than the Fifth Amendment would allow. In light of this background it seems inescapable that Congress was determined to avoid creating nonconstitutional bars to the Government's right to appeal. The District Court's order in this case is therefore appealable unless the appeal is barred by the Constitution.

## B

The statutory restrictions on Government appeals long made it unnecessary for this Court to consider the constitutional limitations on the appeal rights of the prosecution except in unusual circumstances. Even in the few relevant cases, the discussion of the question has been brief. Now that Congress has removed the statutory limitations and the Double Jeopardy Clause has been held to apply to the States, see *Benton* v. *Maryland,* 395 U. S. 784 (1969), it is necessary to take a closer look at the policies underlying the Clause in order to determine more precisely the boundaries of the Government's appeal rights in criminal cases.

As has been documented elsewhere, the idea of double jeopardy is very old. See *Bartkus* v. *Illinois,* 359 U. S. 121, 151–155 (1959) (Black, J., dissenting) ; *United States* v. *Jenkins,* 490 F. 2d 868, 870–873 (CA2 1973). The early development of the principle can be traced through a variety of sources ranging from legal maxims to casual references in contemporary commentary. Although the form and breadth of the prohibition varied widely, the underlying premise was generally that a defendant should not be twice tried or punished for the same offense.

J. Sigler, Double Jeopardy 2–16 (1969).[6]  Writing in the 17th century, Lord Coke described the protection afforded by the principle of double jeopardy as a function of three related common-law pleas: *autrefois acquit, autrefois convict,* and pardon.  With some exceptions, these pleas could be raised to bar the second trial of a defendant if he could prove that he had already been convicted of the same crime.  3 E. Coke, Institutes 212–213 (6th ed. 1680).  Blackstone later used the ancient term "jeopardy" in characterizing the principle underlying the two pleas of *autrefois acquit* and *autrefois convict.*  That principle, he wrote, was a "universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence." 4 W. Blackstone, Commentaries *335–336.

The history of the adoption of the Double Jeopardy Clause sheds some light on what the drafters thought Blackstone's "universal maxim" should mean as applied in this country.  At the time of the First Congress, only one State had a constitutional provision embodying anything resembling a prohibition against double jeopardy.[7]  In the course of their ratification proceedings, however, two other States suggested that a double jeopardy clause be included among the first amendments to the Federal Constitution.[8]  Apparently attempting to accommodate

---

[6] Expressions of the principle can be found in English law from the time of the Year Books, and as early as the 15th century the English courts had begun to use the term "jeopardy" in connection with the principle against multiple trials. See Kirk, "Jeopardy" During the Period of the Year Books, 82 U. Pa. L. Rev. 602 (1934).

[7] Part I, Art. XVI, of New Hampshire's Constitution of 1784 read: "No subject shall be liable to be tried, after an acquittal, for the same crime or offence."  It contained no prohibition, however, against retrial after conviction. 4 F. Thorpe, The Federal and State Constitutions 2455 (1909).

[8] Among the suggested amendments that New York sent to the Congress with its ratification declaration was one that read: "That

these suggestions, James Madison added a ban against double jeopardy to the proposed version of the Bill of Rights that he presented to the House of Representatives in June 1789. Madison's provision read: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." 1 Annals of Cong. 434 (1789). Several members of the House challenged Madison's wording on the ground that it might be misconstrued to prevent a defendant from seeking a new trial on appeal of his conviction. *Id.*, at 753. One of Madison's supporters assured the doubters that the proposed clause merely stated the current law, and that this protection for defendants was implicit in the language as it stood.[9] Madison's wording survived in the House, but in the Senate, his proposal was rejected in favor of the more traditional language employing the familiar concept of "jeopardy." S. Jour., 1st Cong., 1st Sess., 71, 77 (1820 ed.). The Senate's choice of language that tracked Blackstone's statement of the

---

no person ought to be put twice in jeopardy of life or limb, for one and the same offence; nor, unless in case of impeachment, be punished more than once for the same offence." 1 J. Elliott, Debates on the Federal Constitution 328 (1876). This language borrowed heavily from Blackstone's formulation. Maryland also sent a proposed version of the Double Jeopardy Clause, which read: "That there shall be . . . no appeal from matter of fact, or second trial after acquittal; but this provision shall not extend to such cases as may arise in the government of the land or naval forces." 2 Elliott, *supra,* at 550.

[9] From the brief report of the debate it appears that both sides agreed that a defendant could have a second trial after a conviction, but the Government could not have a new trial after an acquittal. Representative Sherman commented: "If the [defendant] was acquitted on the first trial, he ought not to be tried a second time; but if he was convicted on the first, and any thing should appear to set the judgment aside, he was entitled to a second, which was certainly favorable to him." 1 Annals of Cong. 753 (1789).

principles of *autrefois acquit* and *autrefois convict* was adopted by the Conference Committee and approved by both Houses with no apparent dissension. *Id.*, at 87–88; H. R. Jour., 1st Cong., 1st Sess., 121 (1826 ed.).

In the course of the debates over the Bill of Rights, there was no suggestion that the Double Jeopardy Clause imposed any general ban on appeals by the prosecution. The only restriction on appeal rights mentioned in any of the proposed versions of the Clause was in Maryland's suggestion that "there shall be . . . no appeal from matter of fact," which was apparently intended to apply equally to the prosecution and the defense. Nor does the common-law background of the Clause suggest an implied prohibition against state appeals. Although in the late 18th century the King was permitted to sue out a writ of error in a criminal case under certain circumstances,[10] the principles of *autrefois acquit* and *autrefois convict* imposed no apparent restrictions on this right. It was only when the defendant was indicted for a second time after either a conviction or an acquittal that he could seek the protection of the common-law pleas. The development of the Double Jeopardy Clause from its common-law origins thus suggests that it was directed at the threat of multiple prosecutions, not at Government appeals, at least where those appeals would not require a new trial.

## C

This Court's cases construing the Double Jeopardy Clause reinforce this view of the constitutional guarantee. In *North Carolina* v. *Pearce,* 395 U. S. 711

---

[10] The prosecution's appeal rights were generally limited to cases in which the error appeared on the face of the record, or in which the defendant had obtained his acquittal by fraud or treachery. See M. Friedland, Double Jeopardy 287 (1969).

(1969), we observed that the Double Jeopardy Clause provides three related protections:

> "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Id.*, at 717.

The interests underlying these three protections are quite similar. When a defendant has been once convicted and punished for a particular crime, principles of fairness and finality require that he not be subjected to the possibility of further punishment by being again tried or sentenced for the same offense. *Ex parte Lange,* 18 Wall. 163 (1874); *In re Nielsen,* 131 U. S. 176 (1889). When a defendant has been acquitted of an offense, the Clause guarantees that the State shall not be permitted to make repeated attempts to convict him, "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States,* 355 U. S. 184, 187–188 (1957).

The policy of avoiding multiple trials has been regarded as so important that exceptions to the principle have been only grudgingly allowed. Initially, a new trial was thought to be unavailable after appeal, whether requested by the prosecution or the defendant. See *United States v. Gibert,* 25 F. Cas. 1287 (No. 15,204) (CCD Mass. 1834) (Story, J.). It was not until 1896 that it was made clear that a defendant could seek a new trial after conviction, even though the Government enjoyed no similar right. *United States v. Ball,* 163 U. S. 662.[11]

---

[11] This exception to the "one trial" rule has been explained on the conclusory theories that the defendant waives his double

Following the same policy, the Court has granted the Government the right to retry a defendant after a mistrial only where "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States* v. *Perez,* 9 Wheat. 579, 580 (1824).[12]

By contrast, where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended.[13]   In various situations where  appellate review would not subject the defendant to a second trial, this Court has held that an order favoring the defendant could constitutionally be appealed by the Government.   Since the 1907 Criminal Appeals Act, for example, the Government has been permitted without serious constitutional challenge to appeal from orders arresting judgment after a verdict has been entered against the defendant.   See, *e. g., United States* v. *Bramblett,* 348 U. S. 503 (1955) ; *United States* v. *Green,* 350 U. S. 415 (1956) ; *Pratt* v. *United States,* 70 App. D. C. 7, 11, 102 F. 2d 275, 279 (1939).   Since reversal

jeopardy claim by appealing his conviction, or that the first jeopardy continues until he is acquitted or his conviction becomes final, see *Green* v. *United States,* 355 U. S. 184, 189 (1957).   As Mr. Justice Harlan noted in *United States* v. *Tateo,* 377 U. S. 463, 465–466 (1964), however, the practical justification for the exception is simply that it is fairer to both the defendant and the Government.

[12] In *Perez,* the Court emphasized the limited scope of this exception by adding: "To be sure, the power [to declare a mistrial and subject the defendant to retrial] ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."   9 Wheat., at 580.

[13] On a number of occasions, the Court has observed that the Double Jeopardy Clause "prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense." *Helvering* v. *Mitchell,* 303 U. S. 391, 399 (1938).   See also *One Lot Emerald Cut Stones* v. *United States,* 409 U. S. 232, 235–236 (1972) ; *Stroud* v. *United States,* 251 U. S. 15, 18 (1919) ; cf. *United States* v. *Jorn,* 400 U. S. 470, 479 (1971).

on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution.

Similarly, it is well settled that an appellate court's order reversing a conviction is subject to further review even when the appellate court has ordered the indictment dismissed and the defendant discharged. *Forman v. United States*, 361 U. S. 416, 426 (1960). If reversal by a court of appeals operated to deprive the Government of its right to seek further review, disposition in the court of appeals would be "tantamount to a verdict of acquittal at the hands of the jury, not subject to review by motion for rehearing, appeal, or certiorari in this Court." *Ibid.* See also *United States v. Shotwell Mfg. Co.*, 355 U. S. 233, 243 (1957).

It is difficult to see why the rule should be any different simply because the defendant has gotten a favorable post-verdict ruling of law from the District Judge rather than from the Court of Appeals, or because the District Judge has relied to some degree on evidence presented at trial in making his ruling. Although review of any ruling of law discharging a defendant obviously enhances the likelihood of conviction and subjects him to continuing expense and anxiety, a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact.[14]

As we have noted, this Court has had relatively few occasions to comment directly on the constitutional restrictions on Government appeals. The few relevant

---

[14] Judge Learned Hand took this position in *United States v. Zisblatt*, 172 F. 2d 740, 743 (CA2), appeal dismissed on the Government's motion, 336 U. S. 934 (1949). "So long as the verdict of guilty remains as a datum, the correction of errors of law in attaching the proper legal consequences to it do not trench upon the constitutional prohibition."

cases are nonetheless consistent with double jeopardy cases from related areas, in focusing on the prohibition against multiple trials as the controlling constitutional principle.

The Court first addressed the question in *United States* v. *Ball, supra.* After trial on an indictment for murder, the jury found one of the defendants not guilty. The indictment was later determined to be defective, but this Court held that an acquittal, even on a defective indictment, was sufficient to bar a subsequent prosecution for the same offense. 163 U. S., at 669. "The verdict of acquittal was final," the Court wrote, "and could not be reviewed, on error or otherwise, without putting him twice in jeopardy, and thereby violating the Constitution." *Id.*, at 671.

Eight years later the Court was again faced with a double jeopardy challenge to a Government appeal. In *Kepner* v. *United States*, 195 U. S. 100 (1904),[15] the prosecution sought what was in essence a trial *de novo* after the defendant had been acquitted by the court in a bench trial. The Court, relying on the *Ball* case, held that "to try a man after a verdict of acquittal is to put him twice in jeopardy, although the verdict was not followed by judgment." *Id.*, at 133. Permitting an appeal in *Kepner* would in effect have exposed the defendant to a second trial, in violation of the constitutional protection against multiple trials for the same offense.

Respondent contends that *Ball* and *Kepner* stand for

---

[15] The challenge in *Kepner* was based, not on the Constitution, but on a statutory provision that extended double jeopardy protection to the Philippines. While cases construing that statute do not necessarily control the construction of the Double Jeopardy Clause of the Fifth Amendment, see *Green* v. *United States*, 355 U. S., at 197, we accept *Kepner* as having correctly stated the relevant double jeopardy principles.

the proposition that the key to invoking double jeopardy protection is not whether the defendant might be subjected to multiple trials, but whether he can point to a prior verdict or judgment of acquittal. In *Ball,* however, the Court explained that review of the verdict of acquittal was barred primarily because it would expose the defendant to the risk of a second trial after the finder of fact had ruled in his favor in the first. And, although the *Kepner* case technically involved only a single proceeding, the Court regarded the practice as equivalent to two separate trials, and the evil that the Court saw in the procedure was plainly that of multiple prosecution: [16]

> "The court of first instance, having jurisdiction to try the question of the guilt or innocence of the accused, found Kepner not guilty; to try him again upon the merits, even in an appellate court, is to put him a second time in jeopardy for the same offense." 195 U. S., at 133.

The respondent seeks some comfort from this Court's more recent decision in *Fong Foo* v. *United States,* 369 U. S. 141 (1962), but that case, too, reflects the policy against multiple trials in limiting the Government's appeal rights. In *Fong Foo* the trial court had interrupted the Government's case and directed the jury to return verdicts of acquittal as to all the defendants. This Court held that even if the District Court had erred in directing the acquittal, the Double Jeopardy Clause was offended "when the Court of Appeals set aside the judgment of acquittal and directed that the petitioners be

---

[16] Although *Kepner* technically involved only one proceeding, the Court regarded the second factfinding as the equivalent of a second trial. In subsequent cases, this Court has treated the *Kepner* principle as being addressed to the evil of successive trials, see *Stroud* v. *United States,* 251 U. S. 15, 18 (1919); *Palko* v. *Connecticut,* 302 U. S. 319, 322–323 (1937).

tried again for the same offense." *Id.*, at 143. The Court noted that although retrial is sometimes permissible after a mistrial is declared but no verdict or judgment has been entered. the verdict of acquittal foreclosed retrial and thus barred appellate review.

Finally, respondent places great weight on our decision in *United States* v. *Sisson*, 399 U. S. 267 (1970). He claims that *Sisson* extends the constitutional protection against Government appeals to any case in which the ruling appealed from is based upon facts outside the face of the indictment.

*Sisson* arose under the former Criminal Appeals Act and came here on direct appeal from the District Court. The defendant had been tried for refusing to submit to induction, and the jury had found him guilty. On a postverdict motion, however, the District Court entered what it termed an "arrest of judgment," dismissing the indictment on the ground that Sisson could not be convicted because his sincere opposition to the war in Vietnam outweighed the country's need to draft him. The Government sought to appeal the District Court's ruling on the theory that it was within the "arresting judgment" provision of the Criminal Appeals Act. We held that the ruling was not appealable under either the "arresting judgment" or the "motion in bar" provisions of the Act and dismissed the case for want of appellate jurisdiction.

Writing for a plurality of four Justices, Mr. Justice Harlan gave three reasons for his conclusion that the District Court's ruling was not appealable as an arrest of judgment. First, he wrote, the District Court's ruling was not within the common-law definition of an arrest of judgment since it went beyond the face of the record. The Criminal Appeals Act, he noted, was drafted against a common-law background in which the statutory phrase had a "well-defined and limited meaning" that did not

incorporate rulings that relied upon evidence introduced at trial. Second, the District Court's ruling failed to satisfy the statutory requirement that the decision arresting judgment be "for insufficiency of the indictment." The issue of the sincerity of Sisson's beliefs was not presented by the indictment; accordingly, the indictment was not "insufficient" under the appeals statute, since it was sufficient to charge an offense and it did not allege facts that in themselves established the availability of a constitutional privilege. In Part II–C of the opinion, for which Mr. Justice Black provided a majority of the Court, Mr. Justice Harlan explained the third reason for concluding that the District Court's order was not an arrest of judgment: because the order was "bottomed on factual conclusions not found in the indictment but instead made on the basis of evidence adduced at the trial," it was an acquittal "rendered by the trial court after the jury's verdict of guilty." 399 U. S., at 288. The District Court's post-verdict ruling, he wrote, was indistinguishable from a hypothetical verdict of acquittal entered by a jury on an instruction incorporating the constitutional defense that the judge had recognized in his ruling. If the jury had been so instructed and had acquitted, he pointed out, there would plainly have been no appeal under the Criminal Appeals Act. The legislative history of the Act made it clear that Congress did not contemplate review of verdicts of acquittal, no matter how erroneous the constitutional theory underlying the instructions. Nor, he added, could an appeal have been taken consistently with the Double Jeopardy Clause. The latter point was made in the following passage:

> "Quite apart from the statute, it is, of course, well settled that an acquittal can 'not be reviewed, on error or otherwise, without putting [the defendant] twice in jeopardy, and thereby violating the Consti-

tution. . . . [I]n this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offence.' *United States* v. *Ball,* 163 U. S. 662, 671 (1896)." 399 U. S., at 289–290.

Respondent argues that this passage was meant to provide an alternative holding for *Sisson,* that even if the Criminal Appeals Act would permit an appeal on the facts in *Sisson,* the Double Jeopardy Clause would not. In essence, respondent rests his case on what he perceives to be the Court's syllogism in this portion of the *Sisson* opinion: (1) the postverdict ruling was not a common-law arrest of judgment, but an acquittal; (2) under the *Ball* case, an acquittal cannot be appealed without offending the Double Jeopardy Clause; thus, (3) the District Court's ruling in *Sisson* was shielded from review as a matter of constitutional law.

We are constrained to disagree. A more natural reading of this passage suggests that the reference to the Double Jeopardy Clause was meant to apply to the hypothetical jury verdict, not to the order entered by the trial court in *Sisson* itself.[17] Appeal from the hypothet-

---

[17] Under respondent's interpretation of the passage, the reliance on *Ball* is difficult to explain. The rationale of the *Ball* case, and particularly the portion quoted in *Sisson,* turns on the fact that an appeal might result in a second trial, which would not have been necessary in *Sisson.* On the narrower reading of the passage, the reference to *Ball* is precisely in point; the verdict of the hypothetical jury would be unappealable for the very reason stated in the quotation from the *Ball* case.

In addition, respondent's proposed reading of the passage would constitutionalize the very common-law distinctions that the *Sisson* Court anticipated an amended Criminal Appeals Act would eliminate. If no postverdict order except a common-law arrest of judgment is constitutionally appealable, this Court and the courts of appeals would continue to be plagued with the "limitations imposed by [the]

ical jury verdict would have been precluded both by the statute and by the Constitution; appeal from the District Court's actual ruling in the case, however, was barred solely by the statute. The only direct effect of the Constitution on the case was, as the Court pointed out in a footnote following the quoted passage, that after this Court's jurisdictional dismissal, Sisson could not be retried. 399 U. S., at 290 n. 18.[18] Accordingly, we find *Sisson* no authority for the proposition that the Government cannot constitutionally appeal any postverdict order that would have been an unappealable acquittal under the former Criminal Appeals Act.

## D

The Government has not seriously contended in this case that any ruling of law by a judge in the course of a trial is reviewable on the prosecution's motion,[19] although this view has had some support among the commentators since Mr. Justice Holmes adopted it in his dissent to *Kepner* v. *United States, supra.*[20] Mr. Jus-

---

awkward and ancient [Criminal Appeals] Act," 399 U. S., at 308. Worse still, the unhappy task of exploring pleading distinctions that existed at common law would now be imposed on the States, see *Benton* v. *Maryland,* 395 U. S. 784 (1969).

[18] On any view, *Sisson* would have been a singularly inappropriate case in which to decide the constitutional point. The constitutional question was not raised or briefed by the parties, and resolution of the issue in the manner respondent suggests would have marked a significant development in double jeopardy law, deserving of plenary treatment.

[19] The Government has advanced this argument, if rather cautiously, in its brief in a companion case, *United States* v. *Jenkins, post,* p. 358, upon which it has relied in this case. See Brief for United States in *United States* v. *Jenkins,* No. 73–1513, O. T. 1974, pp. 24–25, n. 16.

[20] See, *e. g.,* Mayers & Yarbrough, *Bis Vexari:* New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1, 8–15 (1960); Miller, Appeals by the State in Criminal Cases, 36 Yale L. J. 486 (1927).

tice Holmes accepted as common ground that the Double Jeopardy Clause forbids "a trial in a new and independent case where a man already had been tried once." 195 U. S., at 134. But in his view the first jeopardy should be treated as continuing until both sides have exhausted their appeals on claimed errors of law, regardless of the possibility that the defendant may be subjected to retrial after a verdict of acquittal.

A system permitting review of all claimed legal errors would have symmetry to recommend it and would avoid the release of some defendants who have benefited from instructions or evidentiary rulings that are unduly favorable to them. But we have rejected this position in the past, and we continue to be of the view that the policies underlying the Double Jeopardy Clause militate against permitting the Government to appeal after a verdict of acquittal. Granting the Government such broad appeal rights would allow the prosecutor to seek to persuade a second trier of fact of the defendant's guilt after having failed with the first; it would permit him to re-examine the weaknesses in his first presentation in order to strengthen the second; and it would disserve the defendant's legitimate interest in the finality of a verdict of acquittal.[21] These interests, however, do not apply in the case of a postverdict ruling of law by a trial judge. Correction of an error of law at that stage would not grant the prosecutor a new trial or subject the defendant to the harassment traditionally associated with multiple prosecutions. We therefore conclude that when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the Government

---

[21] See *Ashe* v. *Swenson*, 397 U. S. 436, 446–447 (1970); *id.*, at 455 n. 11, 459 (BRENNAN, J., concurring); *Green* v. *United States*, 355 U. S., at 187; Comment, Double Jeopardy and Government Appeals of Criminal Dismissals, 52 Tex. L. Rev. 303, 340–342 (1974).

may appeal from that ruling without running afoul of the Double Jeopardy Clause.

## III

Applying these principles to the present case is a relatively straightforward task. The jury entered a verdict of guilty against Wilson. The ruling in his favor on the *Marion* motion could be acted on by the Court of Appeals or indeed this Court without subjecting him to a second trial at the Government's behest. If he prevails on appeal, the matter will become final, and the Government will not be permitted to bring a second prosecution against him for the same offense. If he loses, the case must go back to the District Court for disposition of his remaining motions. We therefore reverse the judgment and remand for the Court of Appeals to consider the merits of the Government's appeal.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN joins, dissenting.

Respondent Wilson was indicted for converting to his own use funds of Local 367, IBEW, which he served as business manager and financial secretary. The theory of the prosecution was that respondent had caused union funds to be expended for his daughter's wedding reception. It was undisputed that a check drawn on the union and signed by two union officers, Brinker and Schaefer, had been forwarded to the hotel where the wedding reception had been held, and that the hotel had applied the payment in satisfaction of debts incurred on account of the reception.

The funds were paid in November 1966. An indictment was returned in October 1971, three days prior to the running of the statute of limitations. By that time,

neither of the two signatories to the union check was available to testify in the case. Brinker had died in 1968; Schaefer was terminally ill. Respondent filed a pretrial motion to dismiss the indictment on the ground that preindictment delay violated the Due Process Clause of the Fifth Amendment. See *United States* v. *Marion,* 404 U. S. 307. Specifically, respondent argued that the unavailability of the two signatories, caused by preindictment delay, prejudiced his defense. After two pretrial hearings, the District Court denied the motion.

At the trial, it was established that the local's attorney, one Burke, had made a $1,000 deposit at the hotel where the wedding reception was held, to cover expenses. A bill for the balance had been mailed by the hotel to respondent's home address. Five months later the check signed by Brinker and Schaefer had arrived. The testimony established that the usual procedure for issuance of a check was the completion of a voucher signed by local president Schaefer and the recording secretary, thus signifying approval of the expenditure, preparation of a check by a secretary, and signature by the local president and treasurer. It was established that respondent had first given Brinker and Schaefer their office positions, though they had been elected to the offices they held in the union.

Respondent testified that he had never directed anyone to issue the check in question and that he had reimbursed Burke personally for the $1,000 deposit. He did acknowledge, however, that Burke had told him in November 1966, shortly after the payment reached the hotel, that the bill had been paid.

At the close of evidence respondent renewed his motion to dismiss on account of preindictment delay. The judge withheld decision until receiving the verdict.

The jury found respondent guilty. The District Court

then ruled on respondent's motion. It found that the Government had unreasonably delayed the indictment 16 months after completion of an FBI investigation in 1970. The court found that the delay caused the union president Schaefer to be unavailable as a trial witness. (Brinker had died in 1968, while the Government's investigation was in progress.) Since, in the court's view, the presence of Schaefer, the signer of the check and voucher, would have added "testimony of utmost importance to the trial," the court ruled that respondent had been substantially prejudiced by the delay that deprived the trial of Schaefer's testimony. Accordingly, the court dismissed the indictment.

The Government sought to appeal, arguing that the dismissal had been erroneous. The Court of Appeals held that appeal by the Government violated the Double Jeopardy Clause.

In *United States* v. *Sisson,* 399 U. S. 267, facts developed in the trial of Sisson led a jury to convict him. But after the jury verdict the District Court rendered a postverdict opinion called "an arrest of judgment" which this Court called "a post-verdict directed acquittal," *id.,* at 290, which was described as "a legal determination on the basis of facts adduced at the trial relating to the general issue of the case," *id.,* at 290 n. 19, a reading reaffirmed in *United States* v. *Jorn,* 400 U. S. 470, 478 n. 7.

In the present case the District Court reviewed the evidence given at the trial and concluded that the respondent had been prejudiced because of testimony the missing witness (terminally ill) probably would have added. What was asked on appeal was that the appellate judges review independently the evidence at the trial bearing on guilt and reach a different conclusion. In *United States* v. *Ball,* 163 U. S. 662, 671, the Court said in a dictum that has had a continuing impact on the law:

"The verdict of acquittal was final, and *could not be reviewed,* on error or otherwise, without putting him twice in jeopardy, and thereby violating the Constitution." (Emphasis supplied.)

In *Kepner* v. *United States,* 195 U. S. 100, the defendant was acquitted of an embezzling charge following a nonjury trial in a court of the Philippines. The Government took an appeal to the Supreme Court of the Philippines, which independently reviewed the record and found Kepner guilty. This Court reversed, holding that the Double Jeopardy Clause barred the entry of conviction by the appellate court.* The Court considered appellate review by the Philippine Supreme Court to be equivalent to the second trial in *Ball.* The Court accordingly held:

> "It is, then, the settled law of this court that former jeopardy includes one who has been acquitted by a verdict duly rendered . . . . The protection is not . . . against the peril of second punishment, but against being again tried for the same offense." 195 U. S., at 130.

*Fong Foo* v. *United States,* 369 U. S. 141, involved a trial not completed but promising to be "long and complicated," where the trial judge directed a verdict for the defendants on the ground of prosecutorial improprieties and lack of credibility of Government witnesses. The Court of Appeals had held that the trial judge had no power to direct an acquittal on the record before it. This Court reversed, though the Court of Appeals "thought, not without reason, that the acquittal was based upon an

---

*Technically, the Court was construing, not the Double Jeopardy Clause, but a statute passed by Congress for administration of the Philippines that contained identical language. But the Court treated the question as a constitutional one, finding the above-quoted dictum from *Ball* controlling.

egregiously erroneous foundation," *id.*, at 143. The dictum of *Ball*, quoted above, was deemed controlling. *Ibid.*

In the present case, as in *Fong Foo*, the ruling of the trial court is based in part on the evidence adduced at the trial and in part on other related issues. Thus the issue of a speedy trial in the present case is not reviewable, for it is part and parcel of the process of weighing the Government's evidentiary case against respondent. Therefore we should affirm the judgment below.