EASTERBROOK, Circuit Judge.
The United States has appealed from a district court’s order dismissing an indictment, but without prejudice to a new indictment (should one be returned within the statute of limitations). The district judge took this step to permit appellate review of his discovery order, with which the prosecutor had declined to comply. Once the indictment had been dismissed, the Solicitor General authorized an appeal under the Criminal Appeals Act, 18 U.S.C. § 3731. But a panel of this court dismissed the appeal for lack of jurisdiction, 766 F.3d 722 (7th Cir.2014), ruling that the Act authorizes appeal only if the dismissal of an indictment would be final within the meaning of 28 U.S.C. § 1291. The possibility of reindictment and recurrence of the discovery- dispute made this dismissal non-final, the panel held. We granted the United States’ petition for rehearing en banc.
I
The indictment charges Paul Davis and six confederates — Alfred Withers, Julius Morris, Jayvon Byrd, Vernon Smith, Corey Barbee, and Dante Jeffries — with several federal offenses arising from a plan to rob a stash house, where the defendants believed they would find drugs and money. We need not set out the plan’s details or the precise statutes involved, because proceedings on the merits of the charges never got under way in the district court. What matters now is that the stash house the defendants thought they would rob did not exist. They were caught in a sting.
According to the prosecutor, Davis repeatedly approached someone he thought to be a potential partner in crime and asked whether he knew of any opportunities to conduct robberies. Davis did not know that his interlocutor was cooperating with the FBI. Acting on the informant’s reports, agents bought drugs from Davis three times; this gave some credibility to the informant’s report that Davis was interested in robbing stash houses to get drugs to sell. The FBI passed the information to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which sent an undercover agent to conduct a sting. Posing as a disgruntled drug courier, the agent told Davis about an opportunity to rob a stash house, supposedly containing 50 kilograms of cocaine. Davis recruited assistants (the other six defendants). They discussed the possibility of killing the stash houses’ guards and the undercover agent too in order to eliminate witnesses and avoid sharing the loot. When, arrested at the assembly point for the planned robbery, three of the seven defendants carried firearms.
They maintain that the prosecutor, the FBI, and the ATF engaged in racial discrimination, in violation of the Due Process Clause’s equal-protection component. The *715 defendants told the district court that since 2006 the United States Attorney for the Northern District of Illinois has prosecuted 20 stash-house stings, and that of the defendants in these cases 75 were black and 19 white. According to defendants, 13 of the 19 white defendants were Hispanic. All seven defendants in this prosecution are black. Defendants asserted that these figures “present a picture of stark discriminatory practices by the ATF and FBI who target, through the use of informants and undercover agents, select persons to present with the opportunity to commit a hypothetical ... lucrative crime.”
Defendants asked the judge to direct the prosecutor to provide extensive information about who is prosecuted, how they (and others) were selected for attention by the FBI and ATF, and how the United States Attorney’s office makes decisions after receiving reports from investigators. The prosecutor opposed this motion, contending that United States v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), forbids discovery into prosecu-torial selectivity unless the defense first shows that similarly situated persons have not been prosecuted. The defense’s data about who had been prosecuted did not include any information about who could have been prosecuted, but was not.
The district court entered a discovery order substantially as the defense had proposed it, writing in a short explanation that “the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color. In light of this information, it is necessary to permit Defendants discovery on the following issues.... ” The district court did not identify any similarly situated person who had not been prosecuted or explain why Armstrong allows a court to compel disclosures by the prosecutor in the absence of that information.
Coupled with the breadth of the discovery order (which we discuss in Part III of this opinion), this led the United States to decline to comply. The Criminal Appeals Act does not authorize appeals from discovery orders, but it does authorize appeals from orders dismissing indictments. The district judge agreed to facilitate appellate review by dismissing the indictment without prejudice, and the United States appealed. That brings us to the jurisdictional question.
II
If this were a civil case, and a complaint had been dismissed withoht prejudice in an attempt to permit immediate review of a discovery order, an appeal would not be possible. See, e.g., Doctor’s Associates, Inc. v. Duree, 375 F.3d 618 (7th Cir.2004) (dismissing an appeal where the parties reserved the right to reactivate the litigation later); Furnace v. Board of Trustees, 218 F.3d 666 (7th Cir.2000) (same). For 28 U.S.C. § 1291, which governs most civil appeals, requires a “final decision,” and to be final the dismissal of a complaint generally must be with prejudice. Some statutes, such as 28 U.S.C. § 1292, authorize interlocutory appeals; so do some rules, such as Fed.R.Civ.P. 23(f); but in the main a final decision is essential — and the Supreme Court insists that the exceptions to the final-decision rule be applied sparingly, to avoid dragging litigation out. See, e.g., Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009). The Justices have said that this is likewise true for appeals by defendants in pending criminal cases, which also are covered by § 1291. See, e.g., Flanagan v. United States, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). Compare Abney v. United States, *716 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), with United States v. MacDonald, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978).
But the United States relies on the Criminal Appeals Act, 18 U.S.C. § 3731, which applies exclusively to the prosecutor’s appeals in criminal cases. This statute provides:
In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, • judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the. United States Constitution prohibits further prosecution.
An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
An appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release. The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted. The provisions of this section shall be liberally construed to effectuate its purposes.
Defendants maintain, and the panel held, that the first clause of § 3731’s first paragraph, referring to “a decision, judgment, or order of a district court dismissing an indictment”, covers only the sort of dismissal that would be “final” for the purpose of an appeal under § 1291.
The rest of § 3731 provides context for evaluating this position — as does a comparison with § 1291, which permits appeals from “final” decisions. The word “final” does not appear in § 3731, nor does any similar word.
Context begins with the first paragraph of § 3731, which after mentioning an indictment or information adds “or granting a new trial after verdict or judgment, as to any one or more counts, or any. part thereof’. An order setting a case for a new trial is not a final decision. Nor is an order setting- one count for a new trial, or a “part” of one count for a new trial. And if we read the “count” language as modifying both indictments and new trials — so that we get “dismissing an indictment or information ... as to any one or more counts” — again § 3731 ¶ 1 authorizes appeals from non-final decisions, for in ordinary civil litigation a decision dismissing one count of a complaint cannot be appealed unless the requirements of Fed.R.Civ.P. 54(b) are met.
Paragraph 2 of § 3731 authorizes appeals from orders suppressing or excluding evidence, or ordering the return of property (though the rest of the case continues). Orders excluding evidence and disposing of some property while the litigation continues are not final decisions under § 1291.
' The third paragraph continues the pattern by authorizing an appeal from an order granting a person’s release on bail *717 (while the case proceeds), or denying a motion to modify conditions of release, or to revoke release on bail. None of these orders is a final decision that ends the litigation and leaves nothing but execution of the judgment, the standard definition of “final” under § 1291. See, e.g., Gelboim v. Bank of America Corp., — U.S.-, 135 S.Ct. 897, 902, 190 L.Ed.2d 789 (2015); Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945).
It seems apt to say that all of § 3731 is an exception to the final-decision rule. And so the Supreme Court has described it. In the course of distinguishing appeals under § 1291 from those under § 3731, the Court called § 3731 “a statutory exception to the final judgment rule”. Flanagan, 465 U.S. at 265 n. 3, 104 S.Ct. 1051. If finality were essential then, when responding to the holding of United States v. Sanges, 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed. 445 (1892), that the United States needs express authority to appeal, Congress could have amended § 1291 so that a prosecutor, like other litigants, may use it plus interlocutory appeals by permission under § 1292(b). (Defendant and prosecutor alike also could use 18 U.S.C. § 3742, which authorizes appeals of sentences in criminal cases.) Instead Congress created a separate Criminal Appeals Act and has amended it over the years to include the many categories of non-final orders that we have mentioned. United States v. Wilson, 420 U.S. 332, 336-39, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), traces this history.
Defendants want us to hold that the first clause of § 3731 ¶ 1 alone has an atextual finality requirement, which not only would divorce orders dismissing indictments from every other kind of order under § 3731 but also would create the anomaly that a dismissal of one count would be immediately appealable (though non-final in civil practice) while the dismissal of all counts would not be appealable. Neither the text nor the structure of § 3731 permits such an approach.
Section 3731 authorizes interlocutory appeals in part because the Double Jeopardy Clause of the Fifth Amendment creates special obstacles for a prosecutor who contends that a district court’s order is erroneous. The Supreme Court stressed in decisions such as Mohawk Industries that, if a district court errs, an appeal from the final decision usually allows the mistake to be corrected, if necessary by holding a new trial. But errors in favor of the defense in a criminal prosecution may lead to acquittal, and the prosecution cannot appeal from a mid-trial acquittal by the judge, or an end-of-trial acquittal by the jury, no matter how erroneous the ruling that led to this outcome — even though in parallel civil litigation the losing litigant would have a full appellate remedy. See, e.g., Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962); Sanabria v. United States, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). That’s why § 3731 departs from § 1291 and why it is inappropriate to read into § 3731 a “finality” requirement that it lacks (but §. 1291 contains).
Congress has not taken the final-decision rule as far as it might go. The books are full of exceptions thought helpful to facilitate accurate or prompt decision. We have mentioned § 1292, which permits appeals from orders granting, denying, or modifying injunctions (interlocutory or final) plus orders certified by district judges and accepted by courts of appeals. Another statute, 28 U.S.C. § 1453(c), permits immediate appellate review of orders remanding suits that had been removed on the authority of the Class Action Fairness Act. And § 1447(d) permits appeals of remands in civil-rights cases or those removed by federal officers. Rule 23(f) per *718 mits appeals from orders, certifying or declining to certify class actions. Section 3731 is just another in the complement of exceptions to § 1291’s final-decision rule.
Even if we were disposed to fight against the language of § 3731 (which lacks the word “final”), and its structure, and its objective of accommodating the prosecution’s need to obtain appellate review in a way consistent with the Double Jeopardy Clause, we would still respect the Supreme Court’s description of § 3731 as “remov[ing] all statutory barriers to Government appeals”. Wilson, 420 U.S. at 337, 95 S.Ct. 1013. Ditto, United States v. Martin Linen Supply Co., 430 U.S. 564, 568, 577, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). Perhaps this is an overstatement; after all, § 3731 contains a list of appeal-able orders, which does not include discovery orders. That’s why the prosecutor asked the district court to choose a remedy on the statutory list. But the minimum meaning of the statement in Wilson is that if the district court enters a listed order, there are no further barriers to appeal. A final-decision rule imported from § 1291 would be such a further barrier.
Because discovery orders are not on the § 3731 list, appellate review depended on the district court’s cooperation. The judge chose a response that was listed; if the judge had decided to exclude vital evidence as a sanction for the prosecutor’s stance, that too would have authorized an appeal. It is hard to see why this appeal should be foreclosed because the judge chose what seemed to be the cleanest way to proceed. But if in the future a district judge believes than an interlocutory appeal would be unduly disruptive, the court has only to avoid issuing one of the sorts of orders that fall within the scope of § 3731. ■ The prosecutor cannot dismiss an indictment on his own but requires the court’s approval. Fed.R.Crim.P. 48(a). (The prosecutor may of course decline to proceed with a case, whether or not a judge dismisses the indictment, but a prosecutor can’t appeal from his own decision.) If the judge chooses a response not on the § 3731 list, then to obtain review the prosecutor would need to meet the stringent requirements of a writ of mandamus, a discretionary remedy limited to the clearest errors and usur-pations of power.
Although, as we have mentioned, Wilson may be thought to slight the fact that § 3731 contains a specific list of appealable orders, the Justices themselves seem willing to take the language of Wilson and Flanagan at face value.
United States v. Bass, 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002), offers an illustration. In the wake of Armstrong, which held that discovery relating to a claim of selective prosecution depends on proof that eligible persons of a different race have not been prosecuted, a defendant contended that the Attorney General took race into account when deciding when to authorize a prosecutor to seek capital punishment. The defense offered the same sort of evidence that had been deemed inadequate in Armstrong: that black defendants were charged with capital crimes out of proportion to the general population. The district court ordered discovery into the exercise of prosecutorial discretion and, when the United States declined to provide the information, dismissed the prosecutor’s notice of intent to seek the death penalty. The United States appealed, the court of appeals affirmed, and the Supreme Court summarily reversed, holding the discovery order incompatible with Armstrong. Yet the district court’s order dismissing the notice of intent to seek the death penalty not only was interlocutory (the criminal prosecution remained pending) but also is not on the list in § 3731. Still, the court of appeals and the Supreme Court did not see a *719 jurisdictional problem. We' recognize that an opinion disregarding an issue, even a jurisdictional one, does not establish a holding. See, e.g., Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 91-92, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But the Court may have let the issue pass precisely because it sees no need to retreat from the statements made about § 3731 in Flanagan, Wilson, and Martin Linen.
Other courts of appeals take the Justices at their word. Several have entertained appeals from orders dismissing indictments without prejudice. See, e.g., United States v. Lester, 992 F.2d 174, 176 (8th Cir.1993), and United States v. Woodruff, 50 F.3d 673, 675 (9th Cir.1995). As far as we know, no court of appeals has added a finality requirement to § 3731 ¶ 1 and thus forbidden the appeal from an order dismissing an indictment without prejudice— or for that matter required “finality” for the appeal of any order covered by § 3731.
Defendants insist that United States v. Clay, 481 F.2d 133 (7th Cir.1973) (Stevens, J.), commits this court to a different path. Yet in Clay the court held that § 3731 allows an appeal from an order dismissing an indictment without prejudice. Along the way, Clay remarked that, despite the district court’s choice of label, the order was “final” in the sense that the dispute would not recur. Defendants read that as a holding that if a dispute can recur — as this discovery dispute could recur if another grand jury returned another indictment — then an appeal is forbidden. This reads too much into Clay. Saying “if conclusive, then appealable” (as Clay did) differs from saying “only if conclusive, then appealable.” Clay did not have a non-final order and could not announce a holding about that subject — nor did it purport to do so.
But suppose this is wrong and Clay did think that finality is essential. Since then, the Supreme Court has said repeatedly that barriers (other than the Double Jeopardy Clause) not stated in § 3731 itself do not foreclose appeals. Section 3731 does not contain a final-decision rule. The language in Clay, though not its holding, has been overtaken by developments in the Supreme Court, and this court, sitting en banc in 2015, is not bound by what one panel believed about § 3731 in 1973.
We hold that § 3731 authorizes an appeal when a district court dismisses an indictment, or a count of an indictment, or a. part of a count of an indictment, without prejudice to the possibility of a successive indictment containing the same charge. The court therefore has jurisdiction to decide whether the indictment was properly dismissed, which depends on whether the discovery order was itself proper. {Armstrong reached the Supreme Court in the same way, as the United States used the dismissal of an indictment to present a question about the propriety of a discovery order.)
Ill
Before entering the discovery order, the district court said only that “the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color. In light of this information, it is necessary to permit Defendants discovery” about prosecutorial practices and criteria. That decision is inconsistent with Armstrong. The record in Armstrong showed that every defendant in every crack-cocaine prosecution filed by a particular United States Attorney’s office and assigned to the public defender was black. If, as the Supreme Court held, that evidence did not justify discovery into the way the prosecutor selected cases, then proof that in the Northern District .of Illinois three-quarters of *720 the defendants in stash-house cases have been black does not suffice.
The United States believes that we should stop here and reverse. But things are not that simple. Armstrong was about prosecutorial discretion. The defendants assumed that state -and federal law-enforcement agents arrested all those they found dealing in crack cocaine, and they suspected that the federal prosecutor was charging the black suspects while letting the white suspects go. The Supreme Court replied that federal prosecutors deserve a strong presumption of honest and constitutional behavior, which cannot be overcome simply by a racial disproportion in the outcome, for disparate impact differs from discriminatory intent. See Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). The Justices also noted that there are good reasons why the Judicial Branch should not attempt to supervise how the Executive Branch exercises prosecutorial discretion. In order to give a measure of protection (and confidentiality) to the Executive Branch’s deliberative processes, which are covered by strong privileges, see Cheney v. United States District Court, 542 U.S. 367, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004); In re United States, 503 F.3d 638 (7th Cir.2007); In re United States,' 398 F.3d 615 (7th Cir.2005); United States v. Zingsheim, 384 F.3d 867 (7th Cir.2004), the Court in Armstrong insisted that the defendant produce evidence that persons of a different race, but otherwise comparable in criminal behavior, were presented to the United States Attorney for prosecution, but that prosecution was declined. Bass held the same about the selection of capital prosecutions, and for the same reasons.
To the extent that Davis and the other six defendants want information about how the United States Attorney has exercised prosecutorial discretion, Armstrong is an insuperable obstacle (at least on this record). But the defendants’ principal targets are the ATF and the FBI. They maintain that these agencies offer lucrative-seeming opportunities to black and Hispanic suspects, yet not to those similarly situated in criminal background and interests but of other ethnicity. If the agencies do that, they have violated the Constitution — and the fact that the United States Attorney may have prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery, would not matter, since the constitutional problem would have preceded the prosecutor’s role and could not be eliminated by the fact that things didn’t get worse at a later step. Cf. Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (rejecting a “bottom-line defense” in an employment-discrimination suit).
Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. See Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence. See, e.g., Armstrong v. Daily, 786 F.3d 529 (7th Cir.2015); Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir.2001). Before holding *721 hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.
How does the district court’s order hold up by these standards? Here is its full text, which requires the United States to produce:
(1) A list by case name and number of each phony stash house rip off case brought by the U.S. Attorney’s Office for the Northern District of Illinois in which ATF alone or in conjunction with the FBI was the federal investigatory agency from 2006 to the present. With respect to each case, the Government shall provide the race of each defendant investigated and prosecuted.
(2) For each case identified in response to (1) above, a statement regarding prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the operation. If all such information for a particular case is contained in the criminal complaint, a reference to the complaint is sufficient.
(3) The statutory or regulatory authority for the ATF and the FBI to instigate and/or pursue phony staff [sic] house ripoff cases involving illegal drugs or any decision by any federal agency, the Justice Department or the White House to authorize ATF and the FBI to pursue such cases in the Northern District of Illinois.
(4) All national and Chicago Field Office ATF and FBI manuals, circulars, field notes, correspondence or any other material which discuss phony stash house ripoffs, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.
(5) All documents that contain information on how supervisors and managers of the Chicago area ATF and FBI were to ensure and/or did ensure or check that its agents did not target persons on the basis of their race, color, ancestry, or national origin for the phony stash house ripoffs and what actions the Chicago area ATF and FBI supervisors and managers operating in the Northern District of Illinois took to determine whether agents were not targeting persons for such operations on the basis of their race, color, ancestry, or national origin.
(6) The factual basis for the decision to pursue or initiate an investigation against each of the individuals listed as defendants in each case cited in Paragraph 7 of Defendants’ Motion for Discovery and in response to each case produced pursuant to the request con-' tained in Paragraph (1) above.
(7) All documents containing instructions given during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S.' Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois are not targeted due to their race, color, ancestry, or national origin. Specifically, materials that demonstrate that the individuals charged as defen *722 dants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry, or national origin, and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant’s race, color, ancestry, or national origin.
(8) All documents that contain information about all actions taken during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S. Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry, or national origin and, specifically, that those persons who are defendants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant’s race, color, ancestry, or national origin.
This order is vastly overbroad. A good deal of the discovery it requires is blocked by Armstrong (on the current record) because it concerns the exercise of prosecu-torial discretion. Other discovery is blocked by executive privilege independent of Armstrong; a district court is not entitled to require “the White House” (which is to say, the President) to reveal confidential orders given to criminal investigators. But some of the discovery asks for information from supervisors or case agents of the FBI and ATF, and this is outside the scope of Armstrong, the executive privilege, and the deliberative-process privilege.
To say that some of the information is potentially discoverable is not to vindicate any part of this particular order, however. Consider ¶ 5, which requires the United States to produce “all documents” that contain any “information” about how the FBI and ATF manage stings (pejoratively called “phony stash house ripoffs”), plus all details concerning how these agencies curtail discrimination. This demands the disclosure of thousands (if not millions) of documents generated by hundreds (if not thousands) of law-enforcement personnel. It would bog down this case (and perhaps the agencies) for years.
Or consider ¶ 4, which requires the public disclosure of all criteria the agencies employ to decide when and how to conduct sting operations. Agencies understandably want to keep such information out of the hands of persons who could use it to reduce the chance that their own criminal conduct will come to light. For the same reason that the IRS does not want to reveal its audit criteria, the FBI and ATF do not want to reveal their investigative criteria. Perhaps the FBI and ATF might be able to improve the public’s understanding and acceptance of their selection criteria by releasing more information, but that’s not a legal obligation.
Similar things could be said about other paragraphs, but the point has been made. This order is an abuse of discretion.
The racial disproportion in stash-house prosecutions remains troubling, however, and it is a legitimate reason for discovery provided that the district court does not transgress Armstrong or an applicable privilege.
Instead of starting with a blunderbuss order, a district court should proceed in measured .steps. Logically the first question is whether there is any reason to believe that race played a role in the investigation of these seven defendants. The prosecutor says that it cannot have done, because Davis himself initiated matters by *723 pestering the informant for robbery opportunities and then chose his own comrades. Still, it remains possible that the FBI and the ATF would not have pursued this investigation had Davis been white. Defendants contend that they have additional evidence (beyond that presented to the district court) that could support such a conclusion. The judge should receive this evidence and then decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred. If not, there would not be a basis to attribute this prosecution to the defendants’ race, and the district court could turn to the substance of the charges.
If the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings. Analysis of the targeting criteria (and whether agents followed those rules in practice) could shed light on whether an initial suspicion of race discrimination in this case is justified. Keeping that part of the investigation in camera would respect the legitimate interest of law enforcement in preventing suspects (and potential suspects) from learning how to avoid being investigated or prosecuted. If after that inquiry the judge continues to think that racial discrimination may have led to this prosecution, more information could be gathered.
We do not want to tie the judge’s hands, but we do think it essential, lest this and other prosecutions be sidetracked (both defendants and the public have a right to speedy resolution of criminal cases), to start with limited inquiries that can be conducted in a few weeks, and to enlarge the probe only if evidence discovered in the initial phase justifies a wider discovery program. Only if information learned during these limited inquiries satisfies the Armstrong criteria may discovery be extended to the prosecutor’s office, and even then the judge should ensure that required disclosures make no more inroads on prosecutorial discretion than are vital to ensuring vindication of the defendants’ constitutional right to be free of race discrimination.
The judgment dismissing the indictment is reversed, and the case is remanded for proceedings consistent with this opinion.