In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-3103 & 10-3205

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES McKENZIE and MARIO BARBER,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 720—**Virginia M. Kendall**, *Judge.*

ARGUED JUNE 7, 2011—DECIDED SEPTEMBER 1, 2011

Before EASTERBROOK, *Chief Judge*, and BAUER and
WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge.* On November 6, 2008, a federal
grand jury returned a multi-count indictment against
defendants James McKenzie and Mario Barber, charging
(1) conspiracy to possess with intent to distribute mix-
tures containing in excess of five kilograms of cocaine,
in violation of 21 U.S.C. § 846, and (2) knowingly pos-
sessing and carrying firearms in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(2). McKenzie entered a plea of guilty on both counts and Barber entered a plea of guilty as to the firearms count. On August 18, 2010, the district court sentenced Barber to 120 months' imprisonment and supervised release. On August 27, 2010, McKenzie was sentenced to 200 months' imprisonment and 5 years of supervised release. The defendants now appeal their sentences. For the following reasons, we affirm.

## I. BACKGROUND

McKenzie and Barber were two of four individuals arrested on September 9, 2008 as part of an undercover sting operation involving the planned armed robbery of a drug stash house. On July 1, 2008, co-defendant Tony Mahan met with an undercover agent posing as a drug courier to learn the details of the planned robbery. In a recorded conversation, the agent said he transported approximately five kilograms of cocaine per month for a Mexican drug trafficking organization. He said he was unhappy with the organization and needed a crew to help him rob the stash house. He described that the house typically had three men inside and that he usually saw twenty to thirty kilograms of cocaine being prepared for distribution there. Mahan told the agent he could put together a team of four with multiple firearms to help carry out the robbery and then recruited McKenzie and Barber to help.

On July 22, 2008, the agent met with Mahan and the defendants and discussed at length various methods of

carrying out the robbery. He relayed the same information he had previously told Mahan to McKenzie and Barber and they said they wanted to participate.

On the date of their arrest, September 9, 2008, the defendants waited in a parking lot for a call telling them the location of the stash house. Barber and McKenzie arrived separately, Barber with a firearm. At one point, they entered the agent's car and the agent confirmed the details of the plan they thought they were about to execute. Specifically, he asked whether everyone present was aware that they were going to invade a home suspected of containing twenty kilograms of cocaine, armed with firearms; no one expressed reservations and, shortly after, the defendants were taken into custody. Following their arrest, a loaded .357 revolver was found underneath Barber's seat in the car in which he arrived, a loaded .357 semi-automatic pistol was found underneath McKenzie's seat, and a ballistic vest and latex gloves were found on McKenzie's person.

As part of the factual basis for his plea agreement, McKenzie admitted (1) that between July and September 2008, he conspired with Barber and others to carry out the robbery of a drug stash house containing cocaine, (2) that he had participated in the July 22 and September 9 conversations detailed above, (3) that on the date of the planned robbery, he had armed himself with a .357 semi-automatic pistol to be used in the robbery, and (4) that on the date of the planned robbery, he had worn a ballistic vest. As part of the factual basis for Barber's plea agreement, Barber admitted his involvement from

July to September, 2008 in the conspiracy and his partic-
ipation in the July 22 and September 9 conversations. He
further admitted that he and his co-conspirators had
brought three firearms with them on the date of the
planned robbery, including Barber's own loaded .357
Magnum revolver.

A presentence report ("PSR") calculated each de-
fendant's base offense level under § 2 D1.1 of the Federal
Sentencing Guidelines (the "Guidelines") at 34 for the
type and quantity of drugs involved. Barber had 3 points
subtracted for acceptance of responsibility, bringing
his total offense level to 31. McKenzie had 2 points
added for obstruction because the probation officer
concluded he had lied during a suppression hearing,
bringing his total offense level to 36.

At sentencing, each defendant disputed the amount
of cocaine for which he should be held accountable
under the Guidelines. The district court reviewed tran-
scripts of the recorded conversations and concluded that
the general understanding was that the defendants ex-
pected to recover twenty kilograms or more of cocaine
from the stash house on the planned date of the robbery.
This was consistent with a base Guidelines level of 34,
which covers drug quantities of at least fifteen, but less
than fifty kilograms of cocaine. After reviewing the
factors that must be considered in determining an ap-
propriate sentence under 18 U.S.C. § 3553, the sentences
described above were imposed.

## II. DISCUSSION

We review a district court's interpretation of the Guidelines *de novo* and its findings of fact for clear error. *United States v. Melendez,* 467 F.3d 606, 607 (7th Cir. 2006).

The defendants challenge their sentences based on the district court's finding that the amount of cocaine involved in the planned robbery was at least twenty kilograms, producing a base Guidelines level of 34.

The amount of drugs involved in a conspiracy is a factual question to be reviewed under the "clearly erroneous" standard. *United States v. Cochran,* 955 F.2d 1116, 1124 (7th Cir. 1992). The defendants argue that the district judge's finding was clearly erroneous because the conspiracy to rob the stash house was not predicated on there being any precise amount of cocaine in the house. Though the figure "twenty kilograms" came up on more than one occasion in the recorded conversations, they argue this was not enough to hold them to such a quantity in computing each defendant's Guidelines range.

As this court held in *Cochran,* "[a] defendant is responsible for the amount of drugs that he knew, or should reasonably have foreseen, was the object of the conspiracy." *Id.* Though we have no reason to doubt the defendants' contention that the precise amount of drugs to be seized in the robbery was not a determining factor in each defendant's decision to join the conspiracy, it is undeniable that all were under the impression that a vast quantity of drugs would be discovered at the fictitious stash house. On three separate occasions,

the agent involved in the undercover operation told members of the conspiracy that the house typically contained at least twenty kilos of cocaine; two of these times, both of the defendants who now appeal their sentences were present. We believe this evidence is sufficient to meet the "reasonably foreseeable" standard. Accordingly, we cannot find that the district judge erred in relying on recorded statements to this effect.

The defendants argue that we should adopt an "agreed upon quantity" standard in determining the amount of drugs for which a conspirator may be held liable at sentencing. However, the "reasonably foreseeable" standard is well-established and we decline to stray from it. They also argue that the district court (1) failed to articulate the applicable legal standard when it ruled on the drug quantity attributable to the defendants and (2) failed to conduct an individual assessment of whether the drug quantity was foreseeable to each defendant. These arguments are wholly without merit. At Barber's sentencing hearing, the district judge clearly referenced "reasonable foreseeability as to [the amount of drugs]" the defendants expected to find at the stash house. Given that both defendants have acknowledged their participation in conversations where the quantity of drugs at the fictitious stash house was discussed, there is nothing unique to effect either defendant's understanding of the scale of the plan to consider.

In closing, we echo the district judge's concern that "the weight of the guideline sentence is significantly based upon law enforcement's creation of [the twenty kilogram

amount] being in [the] stash house." The crime proposed was, in the district judge's words, a "massive" one; it is somewhat baffling, then, that the young men who the authorities recruited did not have "massive" criminal histories to match.[1] That said, the defendants' willingness and desire to participate in a crime of such magnitude was unequivocal. Furthermore, the district judge addressed the discomforting factor of the government's role in determining the severity of the Guidelines level to be applied by mitigating the defendants' sentences. Barber's sentence of 120 months' imprisonment was within the Guidelines range the PSR calculated for his stipulated behavior even without accounting for the firearm offense, which increased the range from 108 to 135 months to 168 to 195 months. McKenzie's sentence of 200 months' imprisonment was within a Guidelines range the district court calculated to be 168 to 210 months, a sharp decrease from the PSR calculation of 262 to 327 months.[2]

The defendants do not challenge their sentences as substantively unreasonable. Having found that the district judge did not err in ruling that the defendants could reasonably foresee robbing at least twenty kilo-

---

[1] Barber had one criminal history point for a weapons charge and no prior robbery convictions. McKenzie had a juvenile history with drugs and an adult criminal history which the district judge found had been "overrepresented" in the PSR.

[2] This reduction was based on the court's finding that McKenzie's adult criminal history had been exaggerated.

grams of cocaine from the fictitious stash house, there is nothing more for us to consider.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.